IN THE COURT OF CRIMINAL APPEALS OF TENNESSEE
AT NASHVILLE
November 19, 2002 Session

## STATE OF TENNESSEE v. DENNIS CEDRIC WOODARD, JR.

**Appeal from the Circuit Court for Bedford County**
**No. 14912     Charles Lee, Judge**

———————

**No. M2002-00122-CCA-R3-CD - Filed January 24, 2003**

———————

The Defendant, Dennis Cedric Woodard, Jr., was convicted by a jury of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. In this appeal as of right, the Defendant argues that the evidence presented at trial is not sufficient to sustain his conviction. We affirm the judgment of the trial court.

**Tenn. R. App. P. 3 Appeal as of Right; Judgment of the Trial Court Affirmed**

DAVID H. WELLES, J., delivered the opinion of the court, in which JOE G. RILEY and ALAN E. GLENN, JJ., joined.

Jack Dearing, III and Mike Collins, Assistant Public Defenders, Shelbyville, Tennessee, for the appellant, Dennis Cedric Woodard, Jr.

Paul G. Summers, Attorney General and Reporter; Renee W. Turner, Assistant Attorney General; Mike McCown, District Attorney General; and Michael Randles, Assistant District Attorney General, for the appellee, State of Tennessee.

**OPINION**

The Defendant, Dennis Cedric Woodard, Jr., was convicted by a jury of first degree premeditated murder and sentenced to life imprisonment with the possibility of parole. He now argues on appeal that the evidence presented at trial is not sufficient to support his conviction.

The proof offered by the State demonstrated that on the night of April 13, 2001, the homicide victim, Scott Shafer, was shot near Derry Street in Shelbyville. Earlier that day, at around four o'clock, the victim had been visiting the home of LaShawn Nunnally. Ms. Nunnally testified that sometime later the Defendant arrived at her house carrying a gun. The Defendant pointed the gun at the victim and said, "Nigga, are you real or are you fake?" The victim responded to the Defendant, who was commonly referred to as "Junior," by saying, "Junior, man, quit playing. I'm

fucked up." The Defendant, still pointing the gun at the victim, then repeated his question. At that point, Ms. Nunnally requested that the two men leave the front of her house. The Defendant and the victim went to the rear of the house, and Ms. Nunnally followed. She asked the Defendant for the gun, and he gave it to her. Immediately thereafter, Jarmaine Hill, Ms. Nunnally's boyfriend, and Mike Jones arrived. Mr. Hill inquired what Ms. Nunnally was doing with the Defendant's gun. She responded that she was trying to "prevent trouble." Mr. Hill then demanded that she return the Defendant's gun, which she did, but she kept the clip that contained the bullets and went back around to the front porch of her house. A few minutes later, the four men came to the front of the house, and the Defendant's mouth was bleeding. When Ms. Nunnally asked what had happened, the victim replied, "I dunked him on his head." The Defendant then said to the victim, "Man, you fucked up my grill." Then the Defendant smiled at the victim and added, "You are going to remember this tonight." However, Ms. Nunnally testified that the Defendant and the victim then hugged, made up, and left together in the victim's car. After all the men left, Ms. Nunnally wrapped the pistol clip in toilet paper and tossed it into a creek.

About two hours later, Ms. Nunnally had gone to another house to visit with friends. Jarmaine Hill and Mike Jones arrived; then a few minutes later, the Defendant and the victim drove up. As the day got later, Ms. Nunnally, her two daughters, and the victim decided to walk back to Ms. Nunnally's house to get their jackets. As they returned from getting their coats, the Defendant walked up, pointed the gun at the victim, and said, "Nigga, are you ready to die?" The Defendant then shot the victim, who fell down. He pulled the trigger several more times, but the gun would not fire because the clip had been removed. The Defendant, who then ran away, was wearing a yellow shirt, black denim shorts, black Nike shoes, and black socks. Ms. Nunnally ran to a pay telephone and called 911. She then located the victim, who had run a short distance and fallen down, and she applied a blanket to his wound.

On cross-examination, Ms. Nunnally said that the Defendant appeared intoxicated while he was at her house. She said that his speech was slurred and he was staggering. He also appeared to be intoxicated when she left her friend's house to get the jackets from her house. She said that when the police arrived, she was beside the victim, rendering aid.

Thomas Thompson testified that on the evening of April 13, 2001, he was in his house at 101 Byrd Street. At around 7:40 that night, he heard what sounded like a gunshot. He then looked out his window and saw a white man run between 714 and 716 Derry Street, fall down on the ground, and yell that he had been shot. Then Mr. Thompson looked behind Smith's Food Town on Derry Street and saw a black man in a yellow shirt run behind the store.

James Wheeler testified that at around nine o'clock on the night of April 13, 2001, a young black man, whom he identified as the Defendant, knocked on his door. Mr. Wheeler testified that the Defendant was bleeding from his mouth, and he initially thought that the Defendant had been in a car accident. However, the Defendant said that he had been beaten up, and he asked to use the telephone. While Mr. Wheeler was inside his house retrieving a cordless phone for the Defendant, he decided to call 911 to have an ambulance come render aid to the Defendant. When Mr. Wheeler

went outside to give the Defendant the telephone, he observed a car drive up with a young man and woman inside. Mr. Wheeler recognized the driver of the car as a man named Matt Kelly. The Defendant, who Mr. Wheeler said was "fidgety" and "obviously wanting to leave," got in the car with Mr. Kelly and drove away. On cross-examination, Mr. Wheeler testified that the Defendant was having difficulty breathing and speaking because of the condition of his mouth.

David Williams, an officer with the Bedford County Sheriff's Department, testified that he accompanied the ambulance to Mr. Wheeler's residence in response to Mr. Wheeler's 911 call. As he was driving, he passed a white Honda Accord. Upon speaking with Mr. Wheeler, he learned that the subject had left in that car. Officer Williams then followed the Accord to the emergency room parking lot, where he stopped the vehicle. The Defendant was in the back seat, and Officer Williams noticed that he had injuries to his face, he had blood down the front of his body, and he was not wearing a shirt. When the officer asked for his name, the Defendant replied that his name was Simms. However, the driver of the car, Matt Kelly, told the Defendant to tell the truth, and the Defendant then told the officer that his name was Junior Woodard. Officer Williams asked another officer, D'Angelo Inman of the Tennessee Highway Patrol, to pat down the Defendant for weapons. Officer Inman located a Taurus .40 caliber semi-automatic pistol in the Defendant's pocket. The weapon had no clip in the grip. Officer Williams then placed the Defendant in his patrol car and called for the city police. Officer Williams testified that he smelled alcohol on the Defendant, but that the Defendant was coherent and had no trouble walking. Officer Inman, on the other hand, testified that he did not notice an odor of alcohol about the Defendant.

Back at the scene of the shooting, Rod Stacey was the patrolman with the Shelbyville Police Department who first arrived. He testified that he located a white male, whom he recognized as the victim, Scott Shafer, lying on the ground in between 714 and 716 Derry Street. Officer Stacey observed an entrance wound and an exit wound in the victim's left arm and an entrance wound in the victim's abdomen. Officer Stacey testified that the victim did not tell him who shot him or the circumstances surrounding the shooting.

Detective Eric Ely of the Shelbyville Police Department arrived on the scene after other officers had already secured the area and begun searching for evidence. He was directed to an area where David Williams of the Bedford County Sheriff's Department had located a shell casing earlier that evening. Detective Ely photographed the cartridge and took it into evidence. He testified that it was the casing of a .40 caliber bullet. At around 10:25 that evening, Detective Ely went to the hospital where other officers had the Defendant in custody. There he received the Taurus pistol that Trooper Inman had found in the Defendant's pocket. Detective Ely stated that he read the Defendant his rights. Noticing that the Defendant had blood on his lip and some of his teeth were dislodged, he asked him, "What happened to your mouth?" The Defendant replied, "I didn't shoot anybody." The detective testified that he did not smell alcohol on the Defendant during this conversation. Later in his investigation, Detective Ely went to the office of the state medical examiner, where he received the bullet that had been removed from the body of the victim.

Teri Arney is a forensic scientist with the Tennessee Bureau of Investigation. She examined the shell casing found at the scene of the shooting, the bullet extracted from the victim's body, and the handgun found in the Defendant's pocket. She testified that the gun was a Taurus model PT140 .40 caliber semi-automatic pistol. She determined that the bullet and shell casing had been fired and ejected from the Defendant's gun.

Jeff Long is the EMT worker who administered medical aid to the victim. Mr. Long testified that when he encountered the victim, he was pale and sweating. The victim's lack of color indicated blood loss, and the perspiration indicated that he was beginning to go into shock. These signs suggested that the victim was bleeding internally and needed to be flown via helicopter to Nashville for surgery.

Jeffery Guy is a surgeon at Vanderbilt Hospital who treated the victim. He testified that the victim had extremely low blood pressure when he arrived at Vanderbilt. Despite the efforts of the surgical team, Scott Shafer died from blood loss as a result of gunshot wounds to the spleen, pancreas, and intestines.

Feng Li of the state medical examiner's office performed an autopsy on the victim's body on April 14, 2001. He testified that the victim died of gunshot wounds to different internal organs, and that all of the wounds had been caused by a single bullet. He also testified that no alcohol or drugs were detected in the victim's blood.

Rhonda Hill testified that her son Chris received a letter in May of 2001. She recognized the return address on the envelope as being the Bedford County Jail; so she decided to read the letter. The letter was dated May 23, 2001, the day after the Defendant's preliminary hearing. The letter was from the Defendant, who referred to himself as "Juvy." In the letter, the Defendant stated that a girl named Shawn is "running her mouth."[1] The Defendant's letter asked Chris to prevent Ms. Nunnally from making the June 18 court date, which is the date on which the Defendant's case was presented to the grand jury. Finally, the Defendant requested Chris to "hook up with Mickey and burn this bitch house down." After reading the letter, Ms. Hill went to the police station and gave the police the letter. Henry Young, who was in jail with the Defendant, testified that he observed the Defendant writing the letter. Mr. Young testified that after his preliminary hearing on May 22, 2001, the Defendant mentioned LaShawn Nunnally's testimony and that it "needed to be taken care of."

After the State rested its case, the Defendant testified on his own behalf. He stated that, on the afternoon of April 13, 2001, he had been out riding with the victim, Scott Shafer. The Defendant had drunk three quarts of Budweiser beer in thirty minutes when he first joined the victim. After the Defendant left the victim's car, the Defendant decided to walk to LaShawn Nunnally's house. When he arrived, the victim was already there. The two men exchanged words regarding whether the victim had tried to "holler" at the Defendant's girlfriend. At this point, the Defendant testified that his gun was in his pocket. He handed the gun to Ms. Nunnally, and the argument between the

---

[1] "Shawn" refers to LaShawn Nunnally.

Defendant and the victim escalated into a fight. The victim punched the Defendant in the mouth, and the two wrestled on the ground. During the fight, the Defendant suffered a busted lip and lost a tooth. After the fight, the two men apologized to each other, hugged, and left in the victim's car. The Defendant stated that when they left, Ms. Nunnally still had the gun.

The Defendant and the victim then went to a store, where the Defendant bought another quart of beer. After riding around for awhile, the two men returned to Ms. Nunnally's house. When they arrived, Ms. Nunnally and Mike Jones were there. The group was sitting on the front porch talking, when Jarmaine Hill showed up. Mr. Hill and Ms. Nunnally went inside the house for fifteen to thirty minutes. When Mr. Hill came back onto the front porch, he told the Defendant that he wanted to speak with him. The two men walked down the street and talked. The Defendant testified that when they returned, he sat back down on Ms. Nunnally's front porch. Then the Defendant looked up and observed Mr. Hill pointing a gun at the victim. The Defendant stated that Mr. Hill shot the victim. Mr. Hill ran away, but the Defendant remained on the porch. At that time, Ms. Nunnally approached the Defendant, said "Here," and handed him the pistol. The Defendant took the gun and ran. The Defendant said that he ran past Smith's Food Town, and he stopped and knocked on the door of James Wheeler because he did not know how to get to his friend Matt Kelly's house. While he was at Mr. Wheeler's house, Matt Kelly drove up, and the Defendant got in his car. The Defendant testified that they drove to the hospital because he was concerned about the victim. Later on in his testimony, the Defendant admitted writing the letter to Chris Hodge asking him to burn down the house of LaShawn Nunnally "to make her stop lying on [him]."

The defense called Jarmaine Hill as a witness, but he asserted his Fifth Amendment privilege against self-incrimination. Therefore, the trial court declared Mr. Hill unavailable, and the defense called Randall Lottie. Mr. Lottie testified that, while he was incarcerated with Mr. Hill, he heard Mr. Hill say that he killed Scott Shafer. Mr. Hill said that Mr. Shafer owed him money for drugs, and that another person was in jail for his crime.

Based upon this evidence, the jury found the Defendant guilty of first degree premeditated murder. The Defendant argues that the evidence presented at trial is insufficient to support his conviction. Tennessee Rule of Appellate Procedure 13(e) prescribes that "[f]indings of guilt in criminal actions whether by the trial court or jury shall be set aside if the evidence is insufficient to support the findings by the trier of fact of guilt beyond a reasonable doubt." Evidence is sufficient if, after reviewing the evidence in the light most favorable to the prosecution, any rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. See Jackson v. Virginia, 443 U.S. 307, 319 (1979); State v. Smith, 24 S.W.3d 274, 278 (Tenn. 2000). In addition, because conviction by a trier of fact destroys the presumption of innocence and imposes a presumption of guilt, a convicted criminal defendant bears the burden of showing that the evidence was insufficient. See McBee v. State, 372 S.W.2d 173, 176 (Tenn. 1963); see also State v. Buggs, 995 S.W.2d 102, 105-06 (Tenn. 1999); State v. Evans, 838 S.W.2d 185, 191 (Tenn. 1992); State v. Tuggle, 639 S.W.2d 913, 914 (Tenn. 1982).

In its review of the evidence, an appellate court must afford the State "the strongest legitimate view of the evidence as well as all reasonable and legitimate inferences that may be drawn therefrom." Tuggle, 639 S.W.2d at 914; see also Smith, 24 S.W.3d at 279. The court may not "re-weigh or re-evaluate the evidence" in the record below. Evans, 838 S.W.2d at 191; see also Buggs, 995 S.W.2d at 105. Likewise, should the reviewing court find particular conflicts in the trial testimony, the court must resolve them in favor of the jury verdict or trial court judgment. See Tuggle, 639 S.W.2d at 914. All questions involving the credibility of witnesses, the weight and value to be given the evidence, and all factual issues are resolved by the trier of fact, not the appellate courts. See State v. Morris, 24 S.W.3d 788, 795 (Tenn. 2000); State v. Pappas, 754 S.W.2d 620, 623 (Tenn. Crim. App. 1987).

"First degree murder is . . . [a] premeditated and intentional killing of another." Tenn. Code Ann. § 39-13-202(a)(1).

> "[P]remeditation" is an act done after the exercise of reflection and judgment. "Premeditation" means that the intent to kill must have been formed prior to the act itself. It is not necessary that the purpose to kill pre-exist in the mind of the accused for any definite period of time. The mental state of the accused at the time the accused allegedly decided to kill must be carefully considered in order to determine whether the accused was sufficiently free from excitement and passion as to be capable of premeditation.

Id. § 39-13-202(d).

The Defendant argues that the proof of premeditation is lacking, especially in light of the testimony regarding the Defendant's intoxication at the time of the shooting. Our supreme court has held that:

> The element of premeditation is a question of fact to be resolved by the jury. Bland, 958 S.W.2d at 660. It may be established by proof of the circumstances surrounding the killing. Id.; State v. Brown, 836 S.W.2d 530, 539 (Tenn. 1992). As we stated in Bland, there are several factors which tend to support the existence of premeditation which include: the use of a deadly weapon upon an unarmed victim; the particular cruelty of the killing; declarations by the defendant of an intent to kill; evidence of procurement of a weapon; preparations before the killing for concealment of the crime, and calmness immediately after the killing. See State v. Pike, 978 S.W.2d 904, 914 (Tenn. 1998); Bland, 958 S.W.2d at 660; Brown, 836 S.W.2d at 541-42; State v. West, 844 S.W.2d 144, 148 (Tenn. 1992).

State v. Suttles, 30 S.W.3d 252, 261 (Tenn. 2000).

In this case, the evidence is sufficient to support the Defendant's conviction for first degree premeditated murder. Eyewitness LaShawn Nunnally testified that the Defendant pointed a gun at the victim and asked him, "Nigga, are you real or are you fake?" During the ensuing fistfight, the victim injured the Defendant's mouth by punching him in the face. Ms. Nunnally testified that after the fight, the Defendant told the victim, "You are going to remember this tonight." She testified that later that night, after the Defendant and the victim had made up and been out riding together in an automobile, she watched as the Defendant approached the victim, asked, "Nigga, are you ready to die?" and shot him. The Defendant attempted to shoot the victim several times, but the gun contained only one bullet.

Officer David Williams testified that when he apprehended the Defendant in the parking lot of the hospital, the Defendant was carrying a Taurus .40 caliber pistol in his pocket. Officer Williams stated that although the Defendant smelled of alcohol, he had no difficulty walking and was able to communicate — understand and respond — appropriately. Teri Arney of the Tennessee Bureau of Investigation testified that the bullet removed from the body of the victim and the shell casing found at the scene of the shooting had been fired and ejected from the gun found on the Defendant.

Based on this evidence, a rational jury could have found beyond a reasonable doubt that the Defendant killed Scott Shafer intentionally and with premeditation. Accordingly, this issue is without merit.

The judgment of the trial court is affirmed.

_____
DAVID H. WELLES, JUDGE